Anthony James MOORE, Plaintiff,

v.

Timothy SCHUETZLE, Elaine Little, Robert Coad, Denise Senger, Kathleen Bachmeier, Cordell Stromme, Mirna Stromme, Dr. Jeff Hostetter, and Dr. John Hagan, in their individual and official capacities, Defendants.

No. A4–01–038.

United States District Court, D. North Dakota, Southwestern Division.

Feb. 2, 2005.

---

Anthony James Moore, Bismarck, ND, pro se.

Lance Daryl Schreiner, Tracy Vigness Kolb, Zuger, Kirmis & Smith, Bismarck, ND, for Defendants.

## ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT, DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, AND DENYING PLAINTIFF'S MOTION FOR INJUNCTIVE RELIEF

HOVLAND, Chief Judge.

Before the Court are (1) Plaintiff Anthony James Moore's Motion for Summary Judgment filed on November 2, 2004; (2) Defendants Dr. Jeff Hostetter and Dr. John Hagan's Motion for Summary Judgment filed on December 16, 2004; and (3) Defendants Timothy Schuetzle, Elaine Little, Robert Coad, Denise Senger, Kathleen Bachmeier, Cordell Stromme, and Mirna Stromme's Motion for Summary Judgment filed on December 16, 2004. Also before the Court is Plaintiff Anthony James Moore's Motion for Injunctive Relief filed on December 28, 2004. For the reasons set forth below the Defendants' motions for summary judgment are granted, the Plaintiff's motion for summary judgment is denied, and the Plaintiff's motion for injunctive relief is denied as moot.

## I. BACKGROUND

The plaintiff, Anthony James Moore, is an inmate at the North Dakota State Penitentiary ("NDSP") in Bismarck, North Dakota. On April 13, 2004, Moore filed a pro se complaint asserting the Defendants had violated his civil rights pursuant to 42 U.S.C. § 1983. Since the filing of his initial complaint, Moore has filed a plethora of motions and requests. A second amended complaint was filed on May 18, 2004. On December 2, 2004, Moore filed a third amended complaint alleging that his legal mail had been opened outside of his presence on four separate occasions and that officers and employees of the NDSP had been deliberately indifferent to his serious medical needs.

## A. BACKGROUND CONCERNING MOORE'S LEGAL MAIL

Moore alleges that officials at the NDSP opened his legal mail on four separate occasions: December 31, 2002; March 22, 2003; December 24, 2003;[1] and May 10, 2004.

On December 31, 2002, Moore filed a Step One Grievance claiming that his legal mail had been opened outside his presence. *See* Docket No. 144, Exhibit 3–B. In his grievance, Moore asserts that he "received legal mail opened December 30, 2002." *Id.* Chief of Security Cordell Stromme responded to the grievance by stating:

The Letter was opened by the Parole Dept. where it was sent by mistake. The letter came in on a weekend and was sorted by staff other than the regular mail staff. Letters do stick together sometimes. Anyway the mistake was made—the letter was sent to Mr. Moore—with a note apologizing for the mistake and explaining what happened. I do not see that any further action needs to be taken in this situation.

*Id.* On January 7, 2003, Moore filed an identical second Step One grievance, and it was rejected the same day. *Id.* On January 9, 2003, Moore filed a Step Two grievance. *Id.* On January 13, 2003, Warden Scheutzle responded, "I agree with the Step 1 response from COS Stromme." *Id.* On January 15, 2002, Moore filed an ap-

1. Moore's third amended complaint states that his legal mail was opened on December 24, 2004, rather than 2003. Since the third amended complaint was filed on December 2, 2004, the Court presumes Moore intended to assert that his legal mail was opened on December 24, 2003.

peal to the Director of the Department of Corrections, Elaine Little. On February 11, 2003,[2] Director Little responded as follows:

> No one was being deliberately indifferent to you when this piece of mail was opened. You received an explanation and we will not reduce your sentence because mail was mistakenly opened. Your appeal is denied.

*Id.* The record does not identity from whom this piece of mail was sent.

On March 24, 2003, Moore filed a Step One grievance asserting that he "received legal mail opened March 22, 2003." *See* Docket No. 144, Exhibit 3–C. The letter in question was sent from the Fargo Police Department. On April 10, 2003, Administrative Services Manager Denise Senger responded to the grievance:

> Due to the amount of mail we receive daily, some mistakes are periodically made. I can assure you that it was not intentionally done.

*Id.* That same day, Moore filed a Step Two grievance. On April 14, 2003, Warden Schuetzle responded as follows:

> Apparently, your legal mail was inadvertently opened by staff when it came in on a weekend. This is not acceptable. We have changed our practice of sorting and screening mail that arrives on a weekend to prevent the chances this happens again in the future. There will be no award of PBSR, or any other sentence reduction as requested.

*Id.* The next day, April 15, 2003, Moore filed an appeal to Director Little. On April 29, 2003, Director Little responded, in part:

> You have now appealed to me stating that this is an ongoing problem.
>
> The Prisons Department policy requires that legal mail be opened in the presence of the inmate. I do not agree with you that this letter was opened on purpose. I am confident that staff did not read your mail. The Warden has taken appropriate action. Your request for a sentence reduction or the re-starting of your PBSR is denied.

*Id.*

On January 6, 2004, Moore filed a Step One grievance stating:

> on December 24th 2003 a legal letter was opened with a letter opener, taped shut and placed on my bed, attempts made to solve the problem talked about this problem before, please correct it remedy requesting is to stop having my legal mail opened by hateful staff,
>
> please check the 22, 23, day of December 2003 as well to make sure of the date and who the staff member who it was working and check the date to make sure that i in fact have it correct

### "EMERGENCY GRIEVANCE"

*Id.* On January 7, 2004, Barb Gross returned the grievance to Moore because he had exceeded his allowance of one grievance per week.[3] The letter at issue was from the North Dakota Department of Corrections and Rehabilitation. On January 8, 2003, Moore filed a Step Two griev-

---

**2.** Director Little's response is dated February 11, 2002. The Court presumes the response was intended to be dated February 11, 2003.

**3.** Moore has been limited to one grievance a week since March 24, 2003. Moore had been filing up to 20 grievances in one week and once filed eight grievances in a single day.

According to Denise Senger, the Administrative Services Manager at NDSP, "Moore continues to file more than one [grievance] a week, but usually the additional ones do not receive a response and he is told to re-file the grievance the following week if he considers it important." *See* Affidavit of Denise Senger, ¶ 4. (Docket No. 144, Exhibit 3).

ance. Warden Schuetzle responded the same day:

Anthony—This letter is *not* considered legal mail. See Handbook, page 40, 3rd paragraph. The envelope does not identify the name and official status of the sender—It is in a DOCR envelope. Your grievance is denied.

*Id.* Moore then appealed to Director Little. On January 27, 2004, Director Little responded, in part:

Technically, Warden Schuetzle is correct. However, for as long as I can remember, mail from the N.D. Department of Corrections and Rehabilitation has been treated as legal mail when it is addressed to an inmate in one of our facilities, without a return address indicating the specific name of the sender. I do not know exactly what occurred on 12/24/03, but it is possible that a staff member other than the Administrative Services mail clerk who normally receives our mail, processed the letter and inadvertently opened it.

I have directed my staff to include my name in the return address area of the envelope.

*Id.*

On May 17, 2004, Moore filed a Step One grievance indicating:

On May 10, 2004, I received legal mail opened outside of my presence. Officer [illegible] can verify that the envelope was opened when he passed out mail. Attached to this grievance is the envelope as proof, which is clearly stamped legal mail, on the envelope. Attempts made to solve the problem. I have submitted numerous grievances about my legal mail being opened outside of my presence. Remedy requested is an 10 year sentence reduction or one hundred thousand dollars in damages and punitive damages.

*Id.* The letter was from The Innocence Project of Minnesota, and the envelope was stamped "Legal Mail" in bold black letters. On May 18, 2004, Denise Senger responded by stating:

The letter was opened, but not read, based on a previously conveyed misunderstanding that the Innocence Project of Minnesota was not in fact a legal advocacy group.

*Id.* On May 19, 2004, Moore filed a Step Two grievance. Warden Schuetzle responded the same day stating:

An Attorney from the AG's Office informed staff that the "Innocence Project" was not considered legal mail by our policies. A second attorney has since changed that opinion. Staff have now been made aware to treat mail coming from the Innocence Project as legal mail. At the time of this letter arriving here, it was not considered "legal mail."

*Id.* On May 25, 2004, Moore appealed to Director Little. On June 7, 2004, Director Little responded by noting that the error concerning the status of the Innocence Project had been corrected. *Id.*

The NDSP policy regarding an inmate's mail defined privileged correspondence as:

Mail between an inmate and officials in the Department of Corrections & Rehabilitation, appointed or elected officials, Civil Liberties Union, courts, attorneys, law enforcement officials, or child support enforcement units.

*See* Docket No 144, Exhibit 3–A. The policy also provides that privileged correspondence is to be forwarded, unopened, to the inmate. *Id.* The mail is then opened in the inmate's presence to check for contraband. *Id.* The policy further provides:

1. Incoming or outgoing privileged correspondence shall be treated as privileged only if the name, official status and full legitimate address of the recipient appears on the envelope.

2. Incoming or outgoing privileged correspondence may beheld for a reasonable period of time, not to exceed 48 hours, to allow verification of the privileged status of the addressee.

3. Incoming privileged correspondence shall be opened in the presence of the inmate. Outgoing privileged correspondence when suspected of containing contraband may be opened in presence of the inmate upon authorization of the Warden or designee.

*Id.*

## B. BACKGROUND CONCERNING MOORE'S MEDICAL TREATMENT

### 1) ABDOMINAL, GASTRIC, AND TESTICULAR COMPLAINTS

On April 18, 2002, Moore complained of abdominal, upper gastrointestinal problems. He was seen by Dr. G.D. Ebel who prescribed prevacid. *See* Docket No. 144, Exhibit 1–A. During August through December of 2002, Moore requested laxatives on five separate occasions. *See* Docket No. 144, Exhibit 1–B. He was given milk of magnesia on each occasion. *Id.* In July 2003, Moore again requested a laxative. *See* Docket No. 144, Exhibit 1–C.

On March 6, 2004, Moore requested a doctor appointment. *See* Docket No. 144, Exhibit 1–D. Moore complained of extreme pain in both testicles, burning with urination, pain in his lower abdomen, and nausea. Moore repeated his request on March 9, 2004. *See* Docket No. 144, Exhibit 1–E. On March 10, 2004, Dr. John J. Hagan examined Moore. Dr. Hagan diagnosed Moore with epididymitis (swelling of scrotum) and mild urethritis (inflammation of erethra). Dr. Hagan tested Moore for gonorrhea and chlamydia and treated Moore with rocephin and doxycycline. *See* Docket No. 144, Exhibit 1–F.

On March 24, 2004, Moore saw Dr. Hagan again for residual discomfort in the left testicle. Dr. Hagan prescribed levaquin. Dr. Hagan noted there was no swelling, no nodules, no epididymal tenderness, no hernia, and on standing exam Moore had no lesions. *See* Docket No. 144, Exhibit 1–G.

On April 1, 2004, Moore requested an appointment with Dr. Hagan. Moore complained of discomfort in his testicles. *See* Docket No. 144, Exhibit 1–H. Moore was told he must complete his prescription of antibiotics before Dr. Hagan would reevaluate him. *Id.*

On April 4, 2004, Moore requested to be seen by Dr. Hagan. Moore complained of pain in both testicles, nausea, bad smelling gas, and light-colored bowel movements. *See* Docket No. 144, Exhibit 1–H. A nurse told Moore that the levaquin he was taking will sometimes cause painful gas and discolored stools. She stated these symptoms should resolve when the prescription is finished. On April 5, 2004, Moore filed two requests repeating the symptoms previously listed and adding the symptoms of loss of appetite and "severe movements in intestines." Moore was given the same advice by the nurse. *Id.*

On April 10, 2004, Moore requested an appointment with Dr. Hagan. *Id.* Moore complained of terrible smelling gas and stated he had completed all of the medication. *Id.* On April 11, 2004, Moore again requested an appointment with Dr. Hagan. Dr. Hagan responded by stating "there is no effective medical therapy for increased flatus except to cut down on refined sugars in the diet." *Id.*

On April 15, 2004, Moore once again requested an appointment with Dr. Hagan. This time complaining of abdominal pain, "immediate bowel movements every time that I eat," frequent, terrible smelling gas, tiredness and loss of energy. *Id.* A nurse

responded to Moore's request by stating that Dr. Hagan has just responded to Moore's previous request.

On April 21, 2004, Dr. Hagan requested a stool sample from Moore. *See* Docket No. 144, Exhibit 1–K. Pathology Consultants received and tested Moore's stool sample on April 24, 2004. The results were negative for escherichia coli, salmonella, shigella, aeromonas, and campylobacter. *Id.* On April 26, 2004, Dr. Hagan's chart notes reveal a request for a second stool sample. *Id.*

On April 26, 2004, Moore sent the following requests to Dr. Hagan:

Good Morning. You gave and prescribed [illegible] medication whereas you knew that was going to be totally ineffective to what I'm currently suffering from. Instead or prescribing me with the correct medication that is deliberate indifference in medical treatment. There is no need for this unnecessary manipulation at all. Furthermore I respectfully request to be treated from what I'm suffering from as soon as possible, my condition has gotten worse, as you are aware of. Thank You. Good Day.

Good Morning. You never examined my left testicle as Ms. Bachmeier states in an Step 1 grievance. Had you done so, you would have detected and known that a serious infection exists in my body that requires treatment. Once again I reiterate that I'm terrible ill. There is pain on both left and right sides, pain in stomach, intestines and, nauseated, horrible smelling gas, tiredness. Something is always producing and forming in stomach, intestines. On April 21, 2004 I was asked to provide a stool sample. Those results will prove me to be correct and will and prove that further treat-

ment is required. Thank you. Good Day.

*See* Docket No. 144, Exhibit 1–H.

On April 27, 2004, a report from Pathology Consultants set forth a variety of blood test results. *See* Docket No. 144, Exhibit 1–J. The NDSP's nurse's notes from April 27, 2004, contain the following notation:

Phoned lab for results of stool testing, lab states that sample sup was empty [with] no sample present. Another cup was delivered to [patient with] instructions to provide sample for further testing. [Patient] states "I gave one sample already that should be enough."

*See* Docket No. 152, Exhibit P. The same day (April 27, 2004), Dr. Hagan responded to Moore's April 26, 2004, request by stating he was surprised Moore failed to provide a requested stool sample. *Id.*

On April 28, 2004, Moore requested a "serum" from Dr. Hagan who responded that an appointment had been scheduled. *See* Docket No. 144, Exhibit 1–H. On April 29, 2004, Moore twice requested the results of the April 27, 2004, blood and stool samples. *Id.* On April 29, 2004, Dr. Hagan also prepared a review of Moore's complaints. *See* Docket No. 144, Exhibit 1–N. Dr. Hagan stated, in part:

Anthony is clearly obsessing on body function, and has great concerns about his health. He is not reassured by normal exams and normal laboratories. He is unable to tell me what he feels may be wrong, but feels there may be something hidden in his body. I believe his paranoia is affecting his daily living and I believe that his concerns are unwarranted, based on physical exam. I would consider using Risperdal to help to contain his paranoia. I think his quality of life could be improved by doing so. I do not, however, think he would be accepting of this therapeutic alternative as I

present it, as he is clearly perceives (sic) our interactions as adversarial, and feels I am keeping him from appropriate therapy. I will discuss this with the Medical Director and likely bring it up with Anthony at our next meeting. *See* Docket No. 144, Exhibit 1–N. Dr. Hagan requested that Dr. Hostetter review Moore's file. *See* Docket No. 144, Exhibit 1–N.

On April 30, 2004, Moore requested a "liquid syrup." Nurse K. Backmeier responded that Moore's case was going to be reviewed by the Medical Director and that Dr. Hagan would see Moore in three weeks. *See* Docket No. 144, Exhibit 1–H. Moore also requested information about his prescription of prilosec. *See* Docket No. 144, Exhibit 1–O. On April 30, 2004, a pharmacy employee responded that he had given Moore a pharmacy printout about prilosec. *Id.*

On May 3, 2004, Moore filed a request stating that the prescription he received from Dr. Hagan has been "totally ineffective, and has made my condition absolutely worse." *See* Docket No. 144, 1–P. Moore also asserts:

> I currently have a bacterial infection that has not been treated completely and correctly. I therefore request 3 shots of rochepin once a week for 3 weeks, or 500 mg of levaquin for 30 days twice daily not 250 mg. There is nothing adequate about being prescribed the wrong medication which is ineffective. There is nothing adequate about the way I've been treated for this illness, painful bacterial infection. Thank you. Good Day.

*Id.* Dr. Hagan responded by asking Moore to continue his current prescription until their next appointment in three weeks. *Id.*

On May 11, 2003, Dr. Jeff Hostetter completed a review of Moore's medical file. *See* Docket No. 144, Exhibit 1–Q. As to Moore's abdominal complaints, Dr. Hostetter concluded that Dr. Hagan's treatment had been appropriate and referred Moore to the SAU for a psychiatric evaluation. *Id.* Dr. Hostetter also suggested admitting Moore to the Infirmary for 24 hours for observation and ordered the following studies:

> a) Collect 24 hours stool and send for studies that would rule our pancreatic insufficiency. If we monitor him for 24 hours, we will also be able to ascertain whether his is indeed having stools after each meal, and whether they are indeed diarrhea or not.
>
> b) I would order anti-endomysial antibodies and anit-gliadin antibodies to rule out celiac spure. I would check a CRP to make sure that this is also low, as all of his other lab tests would indicate. If this is also low, there is almost a zero chance of having any sort of cancer, inflammatory bowel disease, celiac spure, or other infection.
>
> c) We will check Giardia antigen, just to ensure that this is not the cause of diarrhea that he might be having.
>
> d) Finally, I would consider getting an upper GI with small bowel follow through to verify that his is not having any sort of dumping syndrome or other increased motility issues.

*Id.*

On May 14, 2004, Moore received a psychiatric evaluation conducted by Dr. Cheryl Huber. *See* Docket No 144, Exhibit 1–T. Dr. Huber concluded that Moore did not meet the criteria for involuntary treatment. *Id.*

On May 14, 2004, Moore underwent at "UGI series and small bowel" at Med Center One. *See* Docket No. 144, Exhibit 1–R. On May 15, 2004, Pathology Consultants issued a "Gluten Sensitivity Panel" report. *Id.*

On May 21, 2004, Dr. Hagan examined Moore. *Id.* Dr. Hagan agreed to increase Moore's prescription for prilosec from 20 milligrams to 40 milligrams for two weeks to see if his symptoms improved. *Id.* On May 21, 2004, Dr. Huber also followed up with Moore and asked about the possibility of taking psychotropic medications, and Moore adamantly refused. *Id.* Dr. Hagan asked Dr. William Hanlon to attempt psychological testing. On June 1, 2004, Dr. Hanlon noted that Moore refused to complete the requested testing. *Id.*

On June 10, 2004, Moore presented to Dr. Hagan for a follow-up appointment. *See* Docket No. 144, 1–U. Moore requested treatment with levaquin. When Dr. Hagan told him it was not a medically appropriate treatment, Moore became agitated. *Id.* Dr. Hagan ordered a testicular ultrasound. *Id.* On June 16, 2004, Moore underwent a scrotum, testicle ultrasound at Med Center One. *See* Docket No. 144, Exhibit 1–W. No abnormal findings were identified. *Id.*

On June 18, 2004, Dr. Hagan ordered another stool sample. On June 21, 2004, Pathology Consultants tested the sample for "ova and parasites." *Id.* The test results were negative. *Id.*

On July 8, 2004, Dr. Hagan saw Moore for a follow-up appointment. *See* Docket No. 144, Exhibit 1–Y. Moore repeated many of his previous complaints and expressed disbelief that his tests results could be normal. *Id.* Dr. Hagan discontinued the prilosec prescription and scheduled a follow-up appointment in three weeks. *Id.*

On July 16, 2004, Moore requested an appointment with Dr. Huber. *See* Docket No. 144, Exhibit 1–T. Moore asked for a variety of prescription medications and asserted that his infection is gone but not "the culprits which are parasites." *Id.* Moore subsequently refused to see Dr. Huber for follow-up appointments on September 10, October 1, and November 12, 2004. *Id.*

Moore refused medical appointments on July 29, and August 10, 2004. *Id.* On September 1, 2004, Moore presented to Dr. Hagan for a follow-up appointment. *See* Docket No. 144, Exhibit 1–Z. Moore requested to see another specialist regarding his abdomen, and Dr. Hagan agreed to refer him to gastrology. *Id.* Dr. Hagan also noted:

> [T]he patient continues to be emphatic that he has parasitic infection that nobody can see. He has done research on his own and insists that he needs to be treated with Vermox and Flagyl. He also said he believes we are not being truthful to him and that I am not being truthful to him when I tell him his tests are normal in this regard. He continues to display paranoia and suspicion, as well as open disbelief regarding the test results.

*Id.* Dr. Hagan scheduled Moore for follow-up appointments every three weeks into the foreseeable future. *Id.*

On September 9, 2003, Moore presented to Dr. Hagan for a regularly scheduled follow-up appointment. Dr. Hagan noted that:

> Further evaluation and treatment is hampered by the fact that the patient has repeatedly refused further testing, including CBC, chem 14, and 24 hour stool collection for fecal fat, as well as any repeat tests. Of note, the patient throughout the summer complained of unrelenting diarrhea. When he was held in Observation in order to provide a 24–hour stool sample, under monitoring provided absolutely no stool in a 24 hour period.

*See* Docket No. 144, Exhibit 1–EE.

On October 13, 2004, Moore refused an appointment with Dr. Hagan. *See* Docket No. 144, Exhibit 1–EE.

On October 20, 2004, Moore presented to Dr. Yaser Rayyan at Med Center One's Gastroenterology Clinic. *See* Docket No. 144, Exhibit 1–AA. Dr. Rayyan recommended that Moore avoid milk and dairy products and start a prescription of "Protonix 40 mg p.o. every day." *Id.* Dr. Rayyan also requested stool and blood samples for testing. *Id.* Dr. Rayyan scheduled a follow-up appointment for Moore in six to eight weeks. *Id.* On October 20, 2004, Moore requested the medication prescribed by Dr. Rayyan and was told the prescription was checked in and could be found at "medline." *See* Docket No. 144, Exhibit 1–BB.

Pathology Consultants conducted testing on Moore's blood sample on October 21, 2004, and on Moore's stool sample on October 22–23, 2004. *See* Docket No. 144, Exhibit 1–AA. On October 21, 2004, Moore asserted that the dosage of his protonix should be 50 milligrams rather an 40 milligrams. *See* Docket No. 144, Exhibit 1–BB. Moore was told the prescription was for 40 milligrams and that a 50 milligram dosage did not exist. *Id.*

On October 28, 2004, Moore inquired as to whether Dr. Rayyan had prescribed any new medications for him, and he was told he has a prescription for protonix only. *Id.*

On November 2, 2004, Dr. Hagan saw Moore at a regularly scheduled follow-up appointment. *See* Docket No. 144, Exhibit 1–CC. Prior to his appointment, Moore had spoken with "Loretta" from Advocacy Services and he had requested testing for Giardia lamblia. *Id.* Dr. Hagan told Moore that if Moore was willing to give a stool sample he (Dr. Hagan) would arrange for Giardia testing. Dr. Hagan noted that "[I]n the past when it has been time to test for Giardia the patient at one time supplied an empty cup and on a different occasion refused to provide the 24–hour stool sample in Observation." *Id.*

According to Dr. Hagan, Moore became very agitated and stated he would not provide a stool sample "for you people." *Id.*

On November 2, 2004, Dr. Rayyan's staff informed Dr. Hagan that Moore had sent Dr. Rayyan a letter requesting that a stool sample be tested directly by them and apparently Moore had provided a stool sample directly to the clinic in an envelope in no other container. *Id.*

On November 3, 2004, Dr. Rayyan sent a letter to Dr. Hagan, which stated in part:

[Moore's] follow-up laboratory tests were essentially normal including his complete blood count, liver function test, and electrolytes. His ESR was 5 and the stool studies for Giardia and for ova and parasites were all normal.

Since the stool test for Giardia is not very sensitive, I would recommend a repeat stool test for Giardia specific antigen or empirical treatment with Flagyl 500 mg three times a day for five days.

*See* Docket No. 144, Exhibit 1–AA.

On November 5 and 8, 2004, Moore again asked whether Dr. Rayyan had prescribed any additional medications and he was told nothing else was ordered. *See* Docket No. 144, Exhibit 1–BB. On November 22, 2004, Moore presented to Dr. Hagan for a follow-up appointment. *See* Docket No. 144, Exhibit 1–EE. Moore initially refused to speak with Dr. Hagan. Moore disputed the results of an ESR and Sed Rate test. Dr. Hagan offered him the opportunity to give a stool sample and to be present when it was signed into the chain of custody so that he could be sure it was sent to Dr. Rayyan. Moore refused. *Id.*

On November 23, 2004, Moore filed the following request:

Good Morning. Do not order or schedule me to go over to Medcenter One

solely to give an stool sample. I will not provide one. [Illegible] for that purpose, nor will I allow you to continue to falsify the sample, results, and medical records. This is in regards to an conversation today with Dr. John J. Hagan. Thank You. Good Day.

*Id.* Moore filed a nearly identical request on November 23, 2004.

On November 29, 2004, Moore refused to take his dosage of protonix and stated "They're not the right meds—stop making me take them." *See* Docket No. 144, Exhibit 1–BB. Moore also filed a grievance on November 29, 2004, against Dr. Hagan for refusing to provide the medication mentioned by Dr. Rayyan. *See* Docket No. 149, Exhibit. Warden Schuetzle responded the same day by stating he was not going to answer the grievance because of the pending lawsuit. *Id.*

On December 7, 2004, Director Little sent Moore a letter responding to a grievance filed on December 6, 2004. *See* Docket No. 152, Exhibit T. Moore had requested that he be given the medications recommended by Dr. Rayyan on November 3, 2004. *Id.* Director Little responded:

I am not a medical doctor and I cannot order anyone to give you medications. Recommended means optional or suggested. Dr. Hagan is your primary case physician here and decisions regarding you medical care will be up to him. I do know that you are receiving quality medical care. Your appeal is denied.

*Id.*

### 2) *FINGER COMPLAINT*

On July 28, 2003, Moore requested ibuprofin for his left hand which he had jammed playing basketball the previous evening. *See* Docket No. 144, Exhibit 3, Affidavit of Kathleen Bachmeier, ¶ 3. On July 29, 2003, Moore was taken to the walk-in clinic for evaluation. *Id.* On July 31, 2003, Moore presented to Dr. Tugrul Kihtir at Med Center One. Dr. Kihtir diagnosed a "closed mallet deformity of left fifth finger" and recommended treatment with a splint continuously for five weeks. *See* Docket No. 144, Exhibit 2–A.

On August 20, 2003, Dr. William Canaham at NDSP sent a letter to Dr. Kihtir relaying Moore's wish to have surgery on his finger. *See* Docket No. 144, Exhibit 2–B. On August 27, 2003, Dr. Kihtir sent a letter to nurse Kathy Bachmeier at NDSP stating that Moore wanted to proceed with surgery on his finger, and declining to perform the surgery. *See* Docket No. 144, Exhibit 2–C. On August 29, 2003, Moore presented to Dr. Kihtir for a scheduled follow-up appointment. *See* Docket No 144, Exhibit 2–D. At that time, Moore elected to continue with the splint treatment rather than surgery. *Id.* Dr. Kihtir saw Moore again on September 11, 2003.

At Moore's request, he was sent to Dr. Rick Becker, a plastic surgeon at St. Alexius Medical Center, for a third opinion on his finger. *See* Docket No. 144, Affidavit of Kathleen Bachmeier, ¶ 7. On November 12, 2003, Dr. Becker performed surgery on Moore's finger. *Id.* at ¶ 8.

On November 20, 2003, Moore was treated by Debra Berglof, at NDSP for an infection in his finger. *See* Docket No. 144, Exhibit 2–F. He was prescribed an antibiotic. *Id.* On November 24, 2003, Dr. Hagan removed the stitches and replaced Moore's splint. *Id.* Moore was treated by Dr. Becker on December 1, 2003, and again on December 15, 2003. Dr. Becker prescribed two more weeks with the splint and then light activity for two weeks. *Id.* Moore was scheduled to return to see Dr. Becker on January 5, 2004. *Id.*

On December 29, 2003, Dr. Hagan examined Moore's finger. *See* Docket No. 144, Exhibit 2–G. On January 2, 2004, Moore wrote a letter to the physicians who had been involved in this treatment, the

director of medical services at NDSP, a nurse, and the Deputy Warden. *See* Docket No. 144, Exhibit 2–H. In his letter Moore stated:

> Good morning, doctor becker performed surgery on my finger, the infirmary staff at the north dakota state penitentiary is needlessly preventing me from seeing doctor, doctor beckers orders were for me to see him in his office which was on December 29, 2003 Monday there is something wrong that must be corrected i don't want legal problems i want my finger checked and fixed now, i respectfully request to be seen by doctor becker immediately failure to do so is a deliberate indifference in medical treatment that is continued, enclosed is a certificate of service by mail, as proof of service upon you all thank you for your time do have a wonderful day.

*Id.*

On January 4, 2004, Moore sent another letter to Dr. Hagan, Kathy Bachmeier, and Lana Kuntz.

> good morning, my right finger split open on Friday January 2, 2004 which caused bleeding, it is also extremely painful and swollen, doctor rick c. becker ordered for me to be seen by him on December 29, 2003, doctor john hagan kathy bachmeier lana knutz have all disregarded doctor becker order and replace it with there own you all are needlessly preventing me from seeing doctor and denying me medical services of which are required to fully and finally fix my finger, i respectfully request to be seen by doctor becker immediately due to not seeing doctor as he ordered not on schedule that has caused permenent damage and irreversable effects, this is also a continued deliberate indifference manifesting itself into another form

> by inflicting constant pain, thank you for your time do have a wonderful day.

*See* Docket No. 144, Exhibit 2–J.

On January 6, 2004, Moore attended physical therapy for his finger. *See* Docket No. 144, Exhibit 2–O. The therapist noted Moore had some limitations, but stated this is normal following surgery. *Id.* Moore attended physical therapy again on January 20, 2004. *Id.* During the session, Moore stated he was quite concerned about his progress and the hump on his finger. *Id.* The therapist noted that Moore seemed "paranoid that he will never get full function of his finger again." *Id.*

On January 29, 2004, Correctional Officer Dan Gleich filed an incident report stating that while Moore was at Dr. Becker's office for a follow-up appointment, "Moore admitted to the Doctor that he had 'forced' his finger to bend." *See* Docket No. 144, Exhibit 2–L. Moore was penalized with one month's loss of good time and 15 days disciplinary detention for the intended self-mutilation. *Id.* Dr. Becker's notes from Moore's January 29, 2004, appointment do not mention that Moore had intentionally injured his finger. *See* Docket No. 145, Exhibit A. Dr. Becker noted that the scar tissue needs to mature before any surgery could be performed and suggested an appointment in one to two months to discuss treatment plan. *Id.* An "Outside Medical Services" form from the NDSP, dated January 29, 2004, includes a recommendation from Dr. Becker for "repeat surgery." *See* Docket No. 145, Exhibit. Moore denies injuring himself or telling Deputy Warden Robert Coad or Dr. Becker that he intentionally sabotaged his finger following surgery. *See* Docket No. 145, Affidavit of Anthony James Moore, ¶ 2; Docket No. 145, Affidavit of Anthony James Moore, ¶ 2.

On February 2, 2004, Moore attended physical therapy and told the therapist that he thought Dr. Becker was going to

perform another surgery on his finger. *See* Docket No, 144, Exhibit 2–O. The therapist told Moore that the medical file did not indicate that a second surgery was scheduled. *Id.*

On February 19, 2004, Kathleen Bachmeier sent a memo to Moore advising him that she and Dr. Hostetter had reviewed his case and that the state would not pay for additional corrective surgery because Moore intentionally sabotaged his recent finger repair surgery. *See* Docket No. 144, Exhibit 2–M. Bachmeier stated that a repeat repair is not medically necessary, but that Moore could pursue a repair from his own funds. *Id.*

On March 3, 2004, Moore attended physical therapy but refused to participate. *See* Docket No. 144, Exhibit 2–O. The therapist's notes contain the following:

> The patient reports to physical therapy being very difficult and demanding, and wanting to know if I spoke with Dr. Becker. He continues to report that Dr. Becker ordered him to follow-up in his office within two months. He also reports that Dr. Becker stated he was going to redo surgery at that time. The patient states that the orders have been purposely destroyed. Halfway through our conversation, when trying to reason with Mr. Moore, he states that it would be best for him to leave the premises immediately for the well being of both of us.

*Id.*

In May of 2004, Dr. Hostetter performed a review of Moore's medical file. *See* Docket No. 144, Exhibit 2–N. As to Moore's finger, Dr. Hostetter concluded:

> I have received no word from Dr. Becker as to the need for further evaluation, and we have gone to great lengths to have Mr. Moore evaluated. We will again inform him that he may pursue further treatment on his own, but that the risk of doing further damage actual-

ly with repeat surgery is too high to be medically appropriate, and is not within the standard of care of our community, and therefore is not an appropriate use of Penitentiary medical care.

*Id.*

According to an affidavit of Stephanie Carpenter, a relative of Moore's, dated December 12, 2004, Carpenter spoke with Dr. Becker on December 2, 2004. Carpenter stated Dr. Becker was "more than willing to correct [Moore's] finger." *See* Docket No. 152, Exhibit A. According to an affidavit of Kathleen Bachmeier, dated December 12, 2004, Dr. Becker advised her that he was unwilling to provide Moore with further treatment. *See* Docket No. 144, Exhibit 2, ¶ 14.

## II. STANDARD OF REVIEW

It is well-established that summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Clark v. Kellogg Co.*, 205 F.3d 1079, 1082 (8th Cir.2000). A fact is "material" if it might effect the outcome of the case and a factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The basic inquiry for purposes of summary judgment is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376 (8th Cir.1996). The moving party has the initial burden of demonstrating to the Court that there are no genuine issues of material fact. If the moving party has met this burden, the

non-moving party cannot simply rest on the mere denials or allegations in the pleadings. Instead, the non-moving party must set forth specific facts showing that there are genuine issues for trial. Fed. R.Civ.P. 56(e); *Krein v. DBA Corp.*, 327 F.3d 723, 726 (8th Cir.2003). A mere trace of evidence supporting the non-movant's position is insufficient. A non-movant must present more than a scintilla of evidence and must present specific facts to create a genuine issue of material fact for trial. *F.D.I.C. v. Bell*, 106 F.3d 258, 263 (8th Cir.1997). The facts must generate evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III. *LEGAL DISCUSSION*

### A. *LEGAL MAIL*

■■■■■ It is well-established that inmates have a right to receive mail. *Thornburgh v. Abbott*, 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989). However, that right may be limited by prison regulations that are reasonably related to legitimate penological interests. *Weiler v. Purkett*, 137 F.3d 1047 (8th Cir.1998). The United States Supreme Court has held that an inmate's privileged mail may not be opened for inspections for contraband outside the presence of the inmate and has defined privileged mail as "mail to or from an inmate's attorney and identified as such." *Wolff v. McDonnell*, 418 U.S. 539, 574, 576–77, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *see Cody v. Weber*, 256 F.3d 764, 768 (8th Cir.2001). The question of whether a particular piece of correspon-

dence is "legal mail" is a question of law. *See Sallier v. Brooks*, 343 F.3d 868, 873 (6th Cir.2003) (holding that the "determination of whether particular kinds of correspondence qualify for the constitutional protection accorded a prisoner's 'legal mail' is a question of law properly decided by the court, not one of fact that can be submitted to a jury").

In a majority of the Eighth Circuit cases involving inmate complaints that their "legal mail" was opened outside their presence, the mail at issue was correspondence from an attorney or a "jailhouse lawyer." *See Bear v. Kautzky*, 305 F.3d 802, (8th Cir.2002) (correspondence from an inmate's "jailhouse lawyer" deemed "legal mail" for purposes of a preliminary injunction); *Cody v. Weber* 256 F.3d 764, 767(8th Cir.2001) (legal papers and letters from his attorneys); *Gardner v. Howard*, 109 F.3d 427, 429 (8th Cir.1997) (correspondence from the inmate's attorney) *McMaster v. Pung*, 984 F.2d 948, 953 (8th Cir.1993) (mail from an attorney was "legal mail"); *see also, Jensen v. Klecker*, 648 F.2d 1179, (8th Cir.1981) (finding a "letter from the National Prison Project, bearing the name of an attorney and which was stamped 'Lawyer Client Mail Do Not Open Except in Presence of Prisoner' and which was addressed to [the inmate]" was legal mail); *cf. Weiler v. Purkett*, 137 F.3d 1047, 1051 (8th Cir.1998) (holding a package from an inmate's family member allegedly containing "legal materials" was not considered legal mail); *Phelps v. U.S. Federal Government*, 15 F.3d 735, 740 (8th Cir.1994) (holding mail from a law firm not marked private or confidential was not given the protections of "legal mail").[4]

---

4. In other Eighth Circuit cases discussing an inmate's "legal mail," the correspondence involved is assumed to be "legal" mail. The cases do not identify the correspondence as being from a lawyer or from another source. *Powells v. Minnehaha County Sheriff Depart-* *ment*, 198 F.3d 711, 712 (8th Cir.1999); *Waff v. South Dakota Department of Corrections*, No. 01–3501, 51 Fed.Appx. 615, 616 (8th Cir. Nov.25, 2002) (unpublished); *Foster v. Helling*, No. 99–4094, 2000 WL 328116 (8th Cir. March 29, 2000) (unpublished); *Berry v. Os-*

The Eighth Circuit has not explicitly addressed whether correspondence from other arguably legal sources, i.e. courts, judges, advocacy organizations, or law enforcement officials, is to be considered "legal mail" for the purposes of constitutional protection. However, the Eighth Circuit in *Harrod v. Halford*, 773 F.2d 234, 236 (8th Cir.1985), held that "the mere fact that a letter comes from a legal source is insufficient to indicate that it is confidential and requires special treatment." In *Harrod*, the Eighth Circuit found it permissible for a correctional facility to open letters not properly marked as "confidential" as required by the facility's policy even though the letters were sent by the clerk of the district court, a district judge, a magistrate judge, the United States

Department of Justice, the county corrections department, the bureau of community correctional services, and a law firm. *Id.*[5]

Accordingly, the Court must first determine whether the correspondence in question is considered "legal mail." Moore alleges that his "legal mail" was opened four times outside his presence. The first piece of mail is unidentified. The second piece of "legal mail" was a letter from the Fargo Police Department. The third piece of mail was a letter from the North Dakota Department of Corrections and Rehabilitation. The fourth piece of mail was from the Innocence Project of Minnesota.

It is important to note that simply because the NDSP's policy characterizes a type of correspondence as "privileged mail," this designation is not dispositive of whether the correspondence is "legal mail" as protected by the Constitution. In other words, a prison's policy may be more generous to inmates than what the United States Supreme Court has defined as the minimal protections afforded to inmate's mail. *Weiler v. Purkett*, 137 F.3d 1047, 1051 (8th Cir.1998). In order to set forth a claim under 42 U.S.C. § 1983, an inmate must show a violation of his constitutional rights, not merely a violation of prison policy. *Gardner v. Howard*, 109 F.3d 427, 430 (8th Cir.1997). Thus, the difference between mail that is constitutionally protected and mail that is protected by the prison's policy is critical. The former allows an inmate to proceed with a 42 U.S.C. § 1983 claim, and the later may not.

■ The Court finds that three of the pieces of correspondence in question are not constitutionally protected mail under the definitions set forth by the United States Supreme Court and the Eighth Circuit. The first piece of mail is unidentified. Although the Defendants do refer to it as "legal mail" there is no evidence to support the conclusions of either party that it was in fact "legal mail." Without a description of the letter or who sent it, the Court is not inclined to accept that it is in

*walt*, No. 96–2184, 1997 WL 22836 (8th Cir. Jan.23, 1997) (unpublished); *Sullivan v. Hill*, No. 92–1618EA, 1992 WL 189389 (8th Cir. Aug.11, 1992) (unpublished); *cf. Travis v. Norris*, 805 F.2d 806, (8th Cir.1986) (declining to determine whether a particular piece of correspondence was "legal mail" in light of the fact the correspondence was opened and inspected in the inmate's presence).

5. Other circuits have taken differing views of what constitutes constitutionally protected "legal mail." *See Sallier v. Brooks*, 343 F.3d 868 (6th Cir.2003) (holding that correspon-

dence from the American Bar Association and a clerk of court's office was not legal mail but that correspondence from a court (judge) or an attorney was legal mail); *Keenan v. Hall*, 83 F.3d 1083 (9th Cir.1996) (only mail from an inmate's attorney is considered legal mail); *Bieregu v. Reno*, 59 F.3d 1445 (3d Cir.1995) (mail from a federal judge, clerk of court, or other courthouse address treated as legal mail); *Ramos v. Lamm*, 639 F.2d 559 (10th Cir.1980) (holding that mail from counsel, public officials and agencies regarding either civil or criminal matters was legal mail).

fact "legal mail." While correspondence from the Fargo Police Department and the North Dakota Department of Corrections and Rehabilitation may be defined as privileged correspondence under the NDSP policies, the Constitution does not provide protection for such pieces of mail. Therefore, Moore cannot sustain a 42 U.S.C. § 1983 action based on the opening of such items outside his presence. The Court finds that Moore's complaints regarding the opening of his mail on December 31, 2002; March 22, 2003; and December 24, 2003, are devoid of merit and fail as a matter of law.

■ A much closer question is presented by the May 10, 2004, letter from the Innocence Project of Minnesota.[6] The record is devoid of a description of the contents of this letter. However, even if the Court were to determine that the letter from the Innocence Project was legal mail, Moore's claim would still fail. The Eighth Circuit has held that an "isolated incident, without any evidence of improper motive or resulting interference with [the inmates] right to counsel or to access to the courts, does not give rise to a constitutional violation." *Gardner v. Howard,* 109 F.3d 427, 430–31(8th Cir.1997). The Court finds that Moore has failed to establish that the prison officials acted with an improper motive or that his right to counsel or access to the courts was interfered with by the opening of the letter from the Inno-

cence Project. Thus, Moore's claim regarding the opening of the letter from the Innocence Project fails as a matter of law, even if the letter were considered to be "legal mail."

In summary, the Court finds that Moore's claim that NDSP officials have violated his constitutional rights by opening his "legal mail" fails as a matter of law. However, in reaching this conclusion, the Court does not condone the actions of the NDSP. It is clear from the record that the NDSP violated its own internal procedures for handling what it considers to be the "privileged mail" of inmates. It is not difficult to see how Moore would become upset and frustrated with prison officials who open "privileged mail" outside of his presence. It is clear that more care needs to be taken to ensure that those responsible for sorting and examining incoming mail are aware of the NDSP policy regarding "privileged mail" and that the policy is strictly followed by staff. It appears from the record that Director Little has taken steps to correct the problem.

## B. MEDICAL CARE

■ "The Eighth Amendment scrutinizes the conditions under which prison inmates are confined in order to prevent the inhumane treatment of inmates." *Robinson v. Hager,* 292 F.3d 560, 563 (8th Cir.2002) (citing *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d

---

6. The Court notes that if it were to address the issue of whether the correspondence in question was "legal mail," the Eighth Circuit precedent tends to support the conclusion that the letter from the Innocence Project would not be considered legal mail. The letter from the Innocence Project is similar to the letter from the National Prison Project at issue in *Jensen v. Klecker,* 648 F.2d 1179, 1183 (8th Cir.1981). However, the letter from the National Prison Project included the name of an attorney in the return address and the letter from the Innocence Project did not. The Eighth Circuit has implicitly held that the

lack of an attorney's name appearing in the return address is significant. *Compare Cody v. Weber* 256 F.3d 764, 767(8th Cir.2001) (legal papers and letters from his attorneys considered legal mail) *with Phelps v. U.S. Federal Government,* 15 F.3d 735, 740 (8th Cir.1994) (holding mail from a law firm not marked private or confidential was not give the protections of "legal mail"). Again, it appears the NDSP's policy would consider a letter from the Innocence Project as privileged mail, but the Eighth Circuit has not taken as broad a definition of "legal mail."

811 (1994)). The government is obligated "to provide medical care for those whom it is punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." *Id.* (quoting *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). "For this reason, the Eighth Amendment proscribes deliberate indifference to the serious medical needs of prisoners." *Id.; see Camberos v. Branstad,* 73 F.3d 174, 175 (8th Cir.1995) (requiring an inmate to demonstrate a deliberate indifference to his serious medical needs when alleging a deprivation of medical care). A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that even a lay person would easily recognize the need for a doctor's attention." *Camberos v. Branstad,* 73 F.3d 174, 176 (8th Cir.1995). Deliberate indifference to such a need may be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Robinson v. Hager,* 292 F.3d 560, 563–64 (quoting *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)).

■ It is well-established that a prisoner alleging an Eighth Amendment violation must prove both an objective and subjective element. *See Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). The defendant's conduct must objectively rise to the level of a constitutional violation by depriving the plaintiff of the "minimal civilized measure of life's necessities." *Rhodes v. Chapman,* 452 U.S. 337, 342, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). The defendant's conduct must also reflect a subjective state of mind evincing deliberate indifference to the health or safety of the prisoner. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d

251 (1976). To establish deliberate indifference, the plaintiff must show the defendant was substantially aware of, but disregarded an excessive risk to inmate health or safety. *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

■ To prevail on an Eighth Amendment claim of deliberate indifference, an inmate must prove that (1) a substantial risk of serious harm to the inmate existed and (2) the prison official knew of and disregarded that risk. *See Robinson v. Hager,* 292 F.3d 560, 564 (8th Cir.2002); *Coleman v. Rahija,* 114 F.3d 778, 784 (8th Cir.1997); *Choate v. Lockhart,* 7 F.3d 1370, 1373 (8th Cir.1993). This entails a showing of something more than mere negligence or medical malpractice. *Roberson v. Bradshaw,* 198 F.3d 645 (8th Cir. 1999) (finding that neither negligence nor medical malpractice are sufficient to rise to an Eighth Amendment violation). A claim of deliberate indifference to an inmate's serious medical needs requires that the Plaintiff meet a higher burden of proof than is required in a simple negligence claim. In addition, an inmate's "mere disagreement with the course of his medical treatment" fails to state a claim of deliberate indifference. *Smith v. Marcantonio,* 910 F.2d 500, 502 (8th Cir.1990); *see also Dulany v. Carnahan,* 132 F.3d 1234, 1239–44 (8th Cir.1997).

### 1) *MOORE'S ABDOMINAL, GASTRIC, AND TESTICULAR COMPLAINTS*

The Count finds the claims regarding abdominal, gastric, and testicular complaints asserted by Moore fail as a matter of law. Moore has failed to establish the existence of an objectively serious medical need *or* that there existed a substantial risk of serious harm to him under the circumstances. Moore has also failed to present any evidence which reflects a sub-

jective state of mind evincing deliberate indifference on the part of the Defendants. Therefore, Moore's claim of an Eighth Amendment violation fails as a matter of law.

The Eighth Circuit has consistently recognized that a serious medical need must be supported by medical evidence, such as a physician's diagnosis, or a condition that is obvious to a lay person. *Roberson v. Bradshaw*, 198 F.3d 645, 648 (8th Cir. 1999). The Eighth Circuit has also recognized that "[a] plaintiff's self-diagnosis alone cannot establish that he suffers from a serious medical need when the medical evidence does not support his self-diagnosis." *Id. see Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir.2000) (standard of review; inmate must show more than even gross negligence, and mere disagreement with treatment decisions does not rise to level of constitutional violation); *Long v. Nix*, 86 F.3d 761, 765 (8th Cir.1996) (prison officials do not violate Eighth Amendment when, in exercising professional judgment, they refuse to implement inmate's requested course of treatment).

▬ The record clearly reveals that Moore has been subjected to a multitude of physical examinations, diagnostic tests, and numerous studies designed to determine the etiology of his subjective complaints or concerns regarding his abdominal, gastric and testicular complaints, and his assertion that he suffers from parasites. The undisputed evidence in the record establishes that every physician who has examined and evaluated Moore to date has concluded that he has exhibited no signs or symptoms of parasites. The medical evidence simply does not support Moore's self-diagnosis.

It is clear that Moore is required to provide *some* relevant medical evidence, whether it be through expert testimony or otherwise, to establish the existence of a serious medical need.[7] At a minimum, Moore has an affirmative burden to show there is a genuine issue for trial based upon reliable, verified medical evidence and not simply a self-diagnosis. Aside from his self-diagnosis, Moore has failed to present any medical evidence or expert testimony that demonstrates he has a serious medical need. This does establish a prima facie violation of the Eighth Amendment.

However, even if Moore successfully established that his abdominal, gastric, and testicular complaints constitute a serious medical need, he has not provided the Court with any credible evidence to support the assertion that the Defendants were deliberately indifferent to his medical needs. There is no evidence in the record before the Court to show that the Defendants ignored Moore's persistent complaints or concerns. Rather, the evidence establishes that the Defendants promptly responded to the endless stream of complaints and appeals filed by Moore. There is no evidence in the record to show that the Defendants were deliberately indifferent to Moore's medical needs, or that the Defendants were negligent on in any manner mishandled Moore's case. The mere fact that an inmate disagrees with the course of treatment does not, in and of itself, suffice to establish a violation of the Eighth Amendment.

---

7. Moore has sought a Court ordered physical examination on numerous occasions. As the Court has stated before, Moore has been free to retain his own expert to conduct the requested medical examination and tests subject to satisfying any legitimate security concerns of the NDSP. Moore's previous requests have implicitly included the request that either the Court or the Defendants should bear the burden of the costs of any such examinations. The Court has found the Moore has not demonstrated good cause to order such examinations and has not demonstrated compelling circumstances to impose the entire costs upon the State.

The United States Supreme Court has defined deliberate indifference as something more than negligence. There is simply no evidence in the record before the Court to support a claim of negligence much less any evidence reflecting a deliberate indifference to Moore's medical needs. *See Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). To the contrary, the record before the Court clearly shows that the Defendants were attentive and thorough in the care and treatment rendered.

Moore has also asserted that the Defendants have falsified his medical records, tests, samples, and results. Moore points to an April 27, 2004, nurses note which documents a telephone call between the NDSP nursing staff and an employee from Pathology Consultants. In the nurses note, Pathology Consultants stated that they received an empty stool sample cup. Moore argues this proves the stool sample results dated April 24, 2004, have been falsified by the Defendants because he never provided a stool sample.

A closer review of the record reveals that Moore's assertions are not supported by the evidence. The record establishes that on April 21, 2004, Dr. Hagan requested a stool sample from Moore. *See* Docket No. 144, Exhibit 1–K. Pathology Consultants received and tested Moore's stool sample on April 24, 2004. The results were negative for escherichia coli, salmonella, shigella, aeromonas, and campylobacter. *Id.* The record also establishes that on April 26, 2004, Dr. Hagan's chart notes reveal a request for a second stool sample. *Id.* Moore refused to provide a second sample. In his own words, Moore stated: "On April 21, 2004 I was asked to provide a stool sample. Those results will prove me to be correct and will and prove that further treatment is required." *See* Docket No. 144, Exhibit 1–M.

Moore's refusal to provide a second stool sample explains why the April 27, 2004, report from Pathology Consultants contains only the results of blood testing. *See* Docket No. 144, Exhibit 1–L. Moore's refusal also explains the NDSP's nurse's notes from April 27, 2004. *See* Docket No. 152, Exhibit P. Finally, Dr. Hagen's April 27, 2004, response to Moore's April 26, 2004, request reinforces the fact that Moore refused to provide a second stool sample. *See* Docket No. 144, Exhibit 1–M. Thus, the Court finds there are no unresolved genuine issues of material fact surrounding Moore's claims of falsified medical records and the Defendants are entitled to summary judgment on those issues as a matter of law.

### 2) *FINGER COMPLAINTS*

Moore's complaints that he has been denied treatment for his injured finger also fails as a matter of law. Moore has failed to establish the existence of an objectively serious medical need *or* that there existed a substantial risk of serious harm to him under the circumstances. The record establishes that any further surgical repair of Moore's finger is not considered medically necessary. Even if the Court were to conclude that Moore's finger injury was an objectively serious medical need, Moore has failed to present any evidence which reflects a subjective state of mind evincing deliberate indifference on the part of the Defendants.

The record reveals that after the NDSP refused to provide Moore with a second repair surgery, the prison staff continued to offer Moore physical therapy to improve the functioning of his finger. However, Moore refused to participate in physical therapy. Moore also contends that Dr. Becker is still willing to perform a corrective surgery on his finger. While the record in unclear as to whether Dr. Becker would still consider performing surgery on

Moore, it is clear that the medical staff at the NDSP have determined that additional surgery is not medically necessary and that the NDSP will not provide funds for any additional surgery. The record further establishes that the NDSP is willing to allow Moore to pursue corrective surgery with his own funds. Thus, Moore has not established that the Defendants were substantially aware of, but disregarded an excessive risk to inmate health or safety. Moore's claim of an Eighth Amendment violation as it relates to his finger injury fails as a matter of law. The Court finds that the undisputed evidence demonstrates that Moore has failed to meet his burden of establishing a prima facie violation of the Eighth Amendment.

## IV. CONCLUSION

The Court has carefully and thoroughly reviewed the entire record. In summary, there has been no competent, reliable evidence presented to support a claim of an Eighth Amendment violation as to any of the Defendants. Moore's personal disagreement with the course of treatment provided to date by his treating physicians and staff at NDSP is not sufficient, as a matter of law, to establish a constitutional violation. There are no genuine issues of material fact for trial and, as such, the Defendants are entitled to summary judgment as a matter of law. The Defendants' Motions for Summary Judgment (Docket Nos. 140 & 142) are **GRANTED**. The Plaintiff's Motion for Summary Judgment (Docket No. 109) is **DENIED**. In addition, the Plaintiff's Motion for Injunctive (Docket No. 149) is **DENIED** as moot. The Clerk of Court shall enter judgment accordingly.

**IT IS SO ORDERED.**